**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TINA CUFFIE, | |
| Appellant | No. 3597 EDA 2013 |

Appeal from the Judgment of Sentence November 26, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0005034-2012

BEFORE:  PANELLA, OLSON AND FITZGERALD,* JJ.

MEMORANDUM BY OLSON, J.:                    **FILED FEBRUARY 02, 2015**

Appellant, Tina Cuffie, appeals from the judgment of sentence entered on November 26, 2013, as made final by the denial of Appellant's post-sentence motion on December 9, 2013.  We affirm.

The trial court has thoroughly summarized the underlying facts of this case.  As the trial court explained:

> On March 20, 2012, [Appellant] and Latiff Hadi [(hereinafter "Hadi")] were arrested and charged with murder and related charges in the death of their son, Khalil Wimes. . . . [Appellant and Hadi proceeded to a consolidated bench trial, where the following evidence was produced].
>
> Alicia Nixon was approached in 2006 to raise the child victim in this case, Khalil Wimes, who was not yet born but whose parents [(Appellant and Hadi)] had three children under the supervision of Philadelphia's Department of Human Services [(hereinafter "DHS")].  [Hadi's] mother initially asked if [Ms. Nixon] and her husband [c]ould take in the unborn child, and then a week after he was born, [Hadi], who is [Ms.] Nixon's cousin, asked if [Ms. Nixon]

*Retired Justice specially assigned to the Superior Court.

were still willing to take [in the baby].  When [Ms.] Nixon said yes, [Appellant, Hadi, Hadi's mother, and] a representative of DHS came with Khalil to her home.  [DHS] permitted [Appellant and Hadi] to see Khalil, but not to take custody of him because their home was unfit for a child.

For a time, this arrangement was agreeable to all parties, and [Appellant and Hadi] saw Khalil during the day several times a week[,] but always returned [Khalil] to [Ms. Nixon's] home at night.  Eventually, however, [Hadi] exchanged words with [Ms. Nixon] as he was picking Khalil up for [a] day, and threatened not to return [Khalil to Ms. Nixon] that evening.  [Ms. Nixon] became worried that [Hadi] would follow through on his threat, and [Ms. Nixon] called the police, directing them to meet her at a supermarket where [Appellant] worked and where [Appellant, Hadi, and Khalil] frequently spent time together during the day.  The police made sure that Khalil was returned to [Ms. Nixon's] care, but shortly thereafter [Ms. Nixon] initiated legal proceedings to gain permanent custody of Khalil. . . .

[Appellant and Hadi] contested [Ms. Nixon's custody petition], and [they] were temporarily awarded custody of Khalil shortly after he turned [one year old], in February [] 2007.  One week later, Khalil was returned to [Ms. Nixon's] custody, because [Appellant and Hadi] had failed to obtain [Khalil's] necessary asthma medication and had not followed an appropriate diet for [Khalil, thus causing Khalil] to be hospitalized. . . .

During his first three years when he lived with [Ms. Nixon], Khalil thrived.  He reached early milestones [(like holding a bottle, crawling, and walking)] on or ahead of schedule.  By the time he was three, [Khalil] was learning both English and Arabic, and could read certain words and write his name with assistance.  He was also a healthy eater.  [Ms. Nixon] addressed Khalil's early issues with asthma and eczema with diet and skin cream, and both [issues] cleared up.  [Ms. Nixon] kept many photographs she had taken of Khalil, and in those photographs he appears to have a healthy weight, clear, unscarred skin, and a bright demeanor. . . .

- 2 -

[In] March [] 2009, [] Khalil was removed from [Ms. Nixon's] care and returned to [Appellant and Hadi. Appellant and Hadi did not] allow [Ms. Nixon] any visitation with [Khalil, and Ms. Nixon] did not see [Khalil] again until his funeral.

At approximately 1:00 a.m. on March 20, 2012, Gary Hines, a social worker with DHS, received a hotline call from the Children's Hospital of Philadelphia, [(hereinafter "CHOP")] about a child who had recently come to the hospital and was dead. [Mr. Hines] went to the hospital, as the call indicated that there were other small children in the deceased child's family. . . .

[Once he arrived at CHOP, Mr. Hines] spoke to [Appellant and Hadi]. [Appellant told Mr. Hines] that Khalil had fallen getting out of the tub. She also told him that [Khalil] would not eat regular food, so [she and Hadi] fed him primarily fast food, and that [Khalil] was constantly vomiting. Hadi told [Mr. Hines] that he received a call that Khalil was injured, and then he went to the house and immediately arranged for an elder son to drive them to the hospital.

[Mr. Hines] also observed the body of [Khalil], who at the time of his death was six years of age but [who] appeared [to be] three years of age and was extremely thin. [Mr. Hines] saw a knot on [Khalil's] forehead and lesions in his mouth, as well as marks up and down his body on both sides. [Mr. Hines] also examined [Appellant and Hadi's] other minor child, [but] saw no evidence of abuse [on the child].

Kiwan DaCosta, a social worker at [CHOP], met with [Appellant and Hadi] at the hospital on the night that Khalil died. [Appellant] told [Ms. DaCosta] that Khalil had fallen during his morning bath and injured his face, but had [an] otherwise [] normal day, and that when she went to check on [Khalil] in the evening he was not breathing. . . .

When [Ms. DaCosta] saw Khalil's body, she immediately noticed that he was emaciated and covered with scars and injuries. [Ms. DaCosta testified that, a]lthough [Khalil] was six years old, he looked to her as if he [were] only three. When [Appellant and Hadi] indicated to [Ms. DaCosta] that

they were about to leave the hospital, [Ms. DaCosta] called the police to make sure that they were on their way and would arrive soon. The police arrived before [Appellant and Hadi] left the hospital.

Philadelphia Police Detective Mark Webb took a statement from [Hadi] on March 20, 2012. In that statement, Hadi said that Khalil was accident-prone, and that [Appellant and Hadi] had trouble keeping [Khalil's] weight up because of [Khalil's] vomiting. Philadelphia [Police] Detective Michael McGoldrick took a statement from [Appellant] on March [20], 2012[,] at 4:35 a.m. In [the statement, Appellant] said that Khalil fell getting out of the bath the prior morning and [had] landed on his face. [Appellant] also said that [Khalil] tended to fall frequently and [that Khalil] "marked easily."

Philadelphia [Police] Detective Gregory Santamala took a second statement from [Hadi] on March 21, 2012[,] at 2:30 a.m. In [the statement, Hadi] indicated an awareness that if a doctor saw Khalil's pre-death physical condition, "yes, you would get in trouble." [Hadi] acknowledged that he would "tap him on his butt" but denied using a belt on him. [Hadi] said that sometimes Khalil was punished by [Appellant and Hadi] withholding [Khalil's] food from him. [Hadi] also said that he [had] intended to find housing with his [new] girlfriend [], and move Khalil in with them. . . .

Philadelphia [Police] Detective Howard Peterman took a statement from [Appellant] on March 21, 2012, at 11:35 a.m., in which [Appellant] said that as Khalil was getting out of the bathtub on the morning of the day he died, [Appellant] "popped him in the back of his head and knocked him to the floor," causing [Khalil] to hit his face and split his lip. [Appellant] also reported that for the rest of the day, Khalil seemed weak, wobbly, and disoriented. When asked if she had hit Khalil in the past, [Appellant] said she had done so, with her hand and with a belt. When asked how often she would hit him with a belt, [Appellant] said "it wasn't every day but it was often enough."

Officer Tiffany Richardson[,] of the Philadelphia Police Department's Crime Scene Unit[,] went to [Appellant and Hadi's] home on March [21], 2012, to examine where

[Khalil] received the injuries that led to his death. She saw, and photographed, several blood-spatter stains on the wall in the main hallway across from the bathroom, in [Khalil's] bedroom, in the bathroom, and on a child's toilet in another bedroom, as well as a hook-and-loop lock at the top of the outside of [Khalil's] bedroom. Subsequent testing revealed that at least one of the blood spatter samples collected from the [] apartment walls matched Khalil's DNA, as did a sample from the child's toilet; other samples were inconclusive or did not contain DNA or sufficient DNA for a positive test.

Aaron Cuffie [(hereinafter "Aaron")], [Appellant's] 28-year-old son and Khalil's half-brother, had been told by [Appellant and Hadi] that they installed the latch on Khalil's door in order to keep him from getting food from the kitchen during the night. [Appellant] told Aaron that the marks and bruises on Khalil's face and body were from fights with his younger sister, M.W., and from times when he would "hurt himself" while he was being spanked. Aaron saw Khalil the day before he died, when he looked sick and repeatedly passed out. Aaron told [Appellant] that she should take Khalil to the hospital, and [Appellant] replied that she was going to do that eventually. The next day, when he came to [Appellant's] home and saw that Khalil was unresponsive and appeared not to be breathing, [Aaron] drove [Appellant and Hadi] to the hospital with Khalil.

After he found out that Khalil had died, Aaron became very angry with both [Appellant and Hadi]. At the hospital, [Appellant] told [Aaron] that she was sorry and [Hadi] told him not to say anything to anybody.

Khalil had been home-schooled by [Appellant], and at one point [Hadi] told Aaron that this was because [Appellant and Hadi] did not want anyone to see Khalil and call DHS. Aaron saw Khalil being disciplined by being forced to run up and down the hallway in the family's apartment[. Aaron] said that [Khalil] would frequently fall while he was running. Aaron said that Khalil frequently vomited after eating, and that [Appellant and Hadi] would become angry at [Khalil] and punish him when this happened. On the day before he died, Khalil was made to run up and down the hallway as

punishment for vomiting, and when he fell and hit his head, [Appellant] helped him back up and then directed him to continue running.

Kevin Cuffie [(hereinafter "Kevin")], the 20-year-old son of [Appellant and Hadi], had seen Khalil being sent to stand in a corner for approximately two hours as punishment for transgressions such as getting food from the kitchen without permission. In December [] 2011, [Kevin] noticed that Khalil was listless and weak. [Kevin] mentioned this to [Appellant], who claimed that she was taking [Khalil] to see a doctor. Kevin also noticed the accumulating scars and bruises on Khalil's body, and saw them multiply in the months before his death. [Kevin] saw both [Appellant and Hadi] hit Khalil on various parts of his body as a form of discipline.

Wanda Byrd [(hereinafter "Ms. Byrd")] dated [Hadi] . . . for approximately nine months. Their relationship ended shortly after Khalil's death. In the months prior to [Khalil's] death, [Ms. Byrd] understood [Hadi] to be living with a friend of his near 21st and Mifflin Streets in Philadelphia, and separated from [Appellant]. [Hadi] told [Ms. Byrd] that Khalil was [home-schooled] because [Hadi] was afraid that if Khalil went to school, he and [Appellant] would get into trouble again with DHS due to Khalil's issues with vomiting and wetting himself. [Ms. Byrd] gave [Hadi $20.00] to take Khalil to see someone about his medical issues, but to her knowledge [Hadi] did not follow through. Hadi was with [Ms. Byrd] when [Appellant] called to tell him that Khalil was unresponsive, at which time [Hadi] left to join [Appellant].

Randee Cuffie Shaw [(hereinafter "Randee")], [Appellant's] 26-year-old daughter and [Hadi's step-daughter], testified for [Appellant]. [Randee] lived with [Appellant] from July [2011 until January 2012]. During that time, [Randee] observed [Appellant] hit Khalil with her hand and with a belt on various occasions, sometimes on his head. [Randee] also observed [Hadi] hit [Khalil] with a phone charger cord and with his hand, including at least once on [Khalil's] head. [Randee] noticed marks that she thought were made with an extension cord on Khalil's limbs, and said that she has the same marks on her arms, inflicted by [Hadi]. [Randee]

- 6 -

also saw [Hadi] withholding food from Khalil, and [Randee] would sometimes sneak Khalil extra food while she lived with him.

Dr. Sam Gulino, Chief Medical Examiner for the City of Philadelphia, gave expert testimony as to the cause and manner of Khalil's death, which he attributed to starvation and physical abuse, including a serious recent blow to the head. [Dr. Gulino] described numerous scars from a looped weapon, such as an electrical cord, which covered Khalil's torso, and head and brain injuries in various states of healing. [Dr. Gulino] also described Khalil's extreme state of starvation, as demonstrated by, for instance, loose folds of skin around his buttocks where fat was once stored.

Trial Court Opinion, 2/10/14, at 1-8 (internal citations and footnotes omitted) (some internal capitalization and corrections omitted).

Following a bench trial, both Appellant and Hadi were found guilty of third-degree murder, conspiracy to commit aggravated assault under 18 Pa.C.S.A. § 2702(a)(1), and endangering the welfare of a child.[1] On November 26, 2013, the trial court sentenced both Appellant and Hadi to serve a term of 20 to 40 years in prison for third-degree murder and to serve a consecutive term of ten to 20 years in prison for conspiracy to commit aggravated assault.[2]

_____

[1] 18 Pa.C.S.A. §§ 2502(c), 903(a), and 4304(a)(1), respectively.

[2] Appellant's ten to 20 year term of imprisonment for conspiracy to commit aggravated assault under 18 Pa.C.S.A. § 2702(a)(1) is a statutory maximum sentence that falls outside of the sentencing guideline range. *See* 18 Pa.C.S.A. § 1103(1) (declaring that the statutory maximum penalty for a felony of the first degree is 20 years in prison).

On December 3, 2013, Appellant filed a timely post-sentence motion, wherein she claimed that her sentence was "excessive and unreasonable as a matter of law and fact and imposes a punishment significantly greater than is necessary to accomplish the purposes of sentencing."  Appellant's Post-Sentence Motion, 12/3/13, at 2.  The trial court denied Appellant's post-sentence motion on December 9, 2013 and Appellant filed a timely notice of appeal.

Appellant now raises the following claim to this Court:[3]

> Whether the trial court abused its discretion by imposing a sentence of [ten] to 20 years on the charge of conspiracy to commit aggravated assault[, in as much] as the sentence was far in excess of the sentencing guideline range and was unreasonable under the totality of the circumstances.

Appellant's Brief at 2.

Appellant challenges the discretionary aspects of her sentence. "[S]entencing is a matter vested in the sound discretion of the sentencing judge, whose judgment will not be disturbed absent an abuse of discretion." ***Commonwealth v. Ritchey***, 779 A.2d 1183, 1185 (Pa. Super. 2001). Moreover, pursuant to statute, Appellant does not have an automatic right to appeal the discretionary aspects of her sentence.  ***See*** 42 Pa.C.S.A.

---

[3] The trial court ordered Appellant to file and serve a concise statement of errors complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).  Appellant complied and, within her Rule 1925(b) statement, Appellant listed the claim she currently raises on appeal.

§ 9781(b). Instead, Appellant must petition this Court for permission to appeal the discretionary aspects of her sentence. *Id.*

As this Court has explained:

> [t]o reach the merits of a discretionary sentencing issue, we conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, Pa.R.A.P. 902, 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, [42 Pa.C.S.A.] § 9781(b).

*Commonwealth v. Cook*, 941 A.2d 7, 11 (Pa. Super. 2007).

In the case at bar, Appellant satisfied the first three requirements, as she filed a timely notice of appeal, properly preserved her discretionary challenge in a post-sentence motion, and facially complied with Pennsylvania Rule of Appellate Procedure 2119(f). We must now determine whether Appellant has presented a "substantial question that the sentence appealed from is not appropriate under the Sentencing Code." *Cook*, 941 A.2d at 11.

Generally, to raise a substantial question, an appellant must "advance a colorable argument that the trial judge's actions were: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. McKiel*, 629 A.2d 1012, 1013 (Pa. Super. 1993); *Commonwealth v. Goggins*, 748 A.2d 721, 726 (Pa. Super. 2000) (*en*

*banc*), *appeal denied*, 759 A.2d 920 (Pa. 2000). Moreover, in determining whether an appellant has raised a substantial question, we must limit our review to Appellant's Rule 2119(f) statement. ***Goggins***, 748 A.2d at 726. This limitation ensures that our inquiry remains "focus[ed] on the reasons for which the appeal is sought, in contrast to the facts underlying the appeal, which are necessary only to decide the appeal on the merits." ***Id.*** at 727 (internal emphasis omitted).

Within Appellant's Rule 2119(f) statement, Appellant concedes that the trial court acted within its discretion when it sentenced Appellant to serve 20 to 40 years in prison for third-degree murder. Appellant's Brief at 12. Indeed, Appellant admits that her third-degree murder sentence was "plainly justified by the facts of the case." ***Id.*** Moreover, Appellant concedes that the trial court acted within its discretion when it ordered Appellant to serve her sentence for conspiracy to commit aggravated assault consecutively to her sentence for third-degree murder. ***Id.*** However, Appellant claims that the trial court abused its discretion when it sentenced her to serve ten to 20 years in prison for conspiracy to commit aggravated assault. Appellant argues:

> The sentence of [ten] to 20 years on the charge of conspiracy to commit aggravated assault was far in excess of the high end of the guideline range for that offense, to wit 48 months [in prison]. . . . Accordingly, the minimum of the aggregate sentence of 30 to 60 years for the 45 year old defendant was [six] years longer than recommended by the sentencing guidelines even assuming – as must be conceded – that imposition of consecutive sentences was

entirely appropriate. Thus on the face of [the] matter[], it appears that the imposition of the maximum sentence for the conspiracy charge viewed in connection with the sentence for third degree murder was imposed not because it was appropriate for the charge of conspiracy but rather to simply impose the most draconian aggregate sentence possible, and for that reason was unreasonable.

*Id.*

In other words, Appellant claims that her ten to 20 year term of imprisonment for conspiracy to commit aggravated assault was unreasonable and not reflective of the gravity of the specific offense to which she was convicted. We have held that such a claim raises a substantial question under our Sentencing Code. *See Commonwealth v. Kahley*, 539 A.2d 389, (Pa. Super. 1988) (a claim that "the trial court abused its discretion in imposing a sentence that is outside the guidelines, consistent with the statutory maximum, unreasonable, and not reflective of the minimum amount of time consistent with the gravity of the offense" raises a substantial question under our Sentencing Code). We will therefore consider the merits of Appellant's claim.

Appellant's claim is meritless. Certainly, the trial court has thoroughly explained why its ten to 20 year sentence for conspiracy to commit aggravated assault was appropriate. As the trial court explained at sentencing:

[Appellant,] one of your last words was that you were cowardly, and you both were.

- 11 -

And [the assistant district attorney] a few minutes ago referred to his years of practice and how this is probably the worst case he's seen. And you need to know I've been practicing as a lawyer longer than he [ha]s and this is the worst case I've seen for a lot of reasons.

As an attorney and as a judge, I repeatedly, probably hundreds of times, heard the phrase for third-degree murder – I'm going to read it out loud – for third-degree murder, a killing is with malice if the perpetrator acts with a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of a social duty indicating an unjustified – or indicating an unjustified disregard for the probability of death or great bodily harm, an extreme [in]difference to the value of human life.

I've read that for years. And most of the time, legally, I understand it, but, emotionally, it's rare – rare would it really strike in my heart.

This case describes both of you. This case describes both of you to a T in terms of what you did for almost three years, three years of pain and torture.

You ask for mercy, and I happen to believe that I'm a merciful judge. You got mercy when you did not receive a verdict of first-degree murder. This is not a day for mercy. This is a day for the [c]ourt to try and impose justice.

There will be in the truest sense of the word no justice for Khalil because it's too late. The only thing I can do is, within the framework that I have, try to make a little bit of sense of how society and rules that I have to follow, the factors that I have to consider and impose sentence on you.

And this is the way that I look at it, and I'm saying this so that you understand, particularly in light of [defense counsel's] comments, because you don't see me every day. You don't see the cases that are in front of me every day. But, generally speaking, what's in front of me are young men, 18 to 21, who because they have access to guns make a decision in a minute or two or over a day or two, they pull out a gun and they shoot someone. And I get a third-

- 12 -

degree verdict on a regular basis in this room. And I sentence those young men for their stupidity, for their recklessness, on a regular basis to 20 to 25 years in jail. That's what the law calls for, or a minimum of around 15.

Their lives and the price they pay is based on youth, immaturity, and decisions that are made sometimes in the blink of a second or a half-hour or an hour when they're angry.

This isn't this case. This isn't this case. I have thought about this case for weeks. And what I keep coming back to is that at any point during that time either one of you could have stopped this.

But let's go back even before that. For the life of me, I cannot imagine why you chose to get Khalil back [from Ms. Nixon] other than for your own egos. You were struggling. I accept that. Your other children had been taken away. You were blessed with [Khalil] and with [another child, M.W.]. And one of the most disturbing parts to me about this case is that [M.W.] had to watch you torture her brother.

What kind of loss – and we just heard a little bit about that or what damage has that done to her. What damage has this case done to your older [children] . . . Kevin and his brother, they were the ones that finally made you take [Khalil] to the hospital. Neither one of you chose to take him to the hospital when he was in pure agony when he was dying.

So, . . . for a variety of reasons, and I'm going to list them because I can't give either of you the low end of the standard range. That would be doing a disservice to the oath that I took not only to protect the members of society but to maintain my own integrity in sentencing and give you what I think this case is worth.

. . .

I'm going to tell you one other thing before I sentence you. It may not seem like this, but the only shred of responsibility I saw in this case was that you had me hear

- 13 -

the case rather than a jury and you didn't put 14 people through the pain and suffering of looking at those pictures [of Khalil]. So you are going to get a benefit from that. It may not be what you hoped for, but you'll get it.

I want to say one other thing before I sentence you, because then you're going to get your rights. I see a picture of your son. I don't see a picture of your son through the Medical Examiner's picture. I see the picture of your son that I saw when he was a happy, fun-loving kid, and that's the image that I will keep with me because that's what he deserves. No one, particularly a child, the most vulnerable of us, deserves to be remembered in the condition that you put him in.

It is hereby the sentence of the [c]ourt for [Appellant and Hadi], your sentences are going to be the same, because I think you both deserve it, 20 to 40 years on murder of the third degree; on conspiracy, ten to 20 years, which is a consecutive sentence; and no further penalty on endangering the welfare of a child.

Your total sentence is 30 to 60 years, each of you.

I am deviating on the conspiracy bill because it is an upward departure because of the pain and suffering that you inflicted on three families, not just each of your own individual families, because of the effect that this case has on your biological children, as well as the siblings of the decedent in this case, because of the fact that anything less I think would diminish the seriousness and because of what I told you earlier, at any point either one of you could have stopped this and you chose not to.

N.T. Sentencing, 11/26/13, at 100-105.

Moreover, with the trial court's opinion to this Court, the trial court again explained that its statutory maximum sentence for Appellant's conspiracy to commit aggravated assault conviction was necessitated by the terrible facts of this case and, in particular, by the fact that, over the course

of three years, Appellant and Hadi conspired to mentally and physically torture their own, defenseless child – and that their methods of torture included Khalil's starvation. As the trial court explained:

> In this matter, [the trial c]ourt reviewed pre-sentence reports and mental health reports pertaining to both [Appellant and Hadi] prior to imposing sentence. Th[e trial c]ourt heard from numerous witnesses, including several members of [Appellant's and Hadi's] families. Both [Appellant and Hadi] elected to allocute *[sic]* and made extended statements, which th[e trial court] considered. Finally, taking into account all relevant facts and balancing the needs of the public, the gravity of the offense, and the rehabilitative needs of [Appellant and Hadi, the trial court] imposed a guideline sentence as to third-degree murder and an enhanced sentence as to conspiracy to commit aggravated assault. As to the latter, [the trial court] stated during sentencing that the upward departure was because anything [less] would diminish the seriousness of the crime, because the crime impacted so many people, including the decedent's siblings, both older and younger, and because [Appellant and Hadi] made repeated decisions to continue abusing [Khalil] and denying him both food and care.
>
> . . .
>
> This is not a case where two people enter into a conspiracy to commit a single act, however deplorable, of aggravated assault resulting in serious bodily injury. This is a conspiracy that can be read upon the body of its victim, and that involved systemic physical torture and deprivation over the course of years. At any time, either [Appellant or Hadi] could have turned away from this course of action and sent Khalil back into the loving home where he was raised for three years, and from which they wrested him forcibly through the court system. The extreme reprehensibility of their crime demanded an upward departure, and [the trial court] was compelled to impose such a sentence, by the needs of the community as well as [Appellant and Hadi's] rehabilitative needs, which are of the utmost severity. . . . [N]o lesser sentence would address the crimes charged under our sentencing scheme. . . .

- 15 -

Trial Court Opinion, 2/10/14, at 14-16 (some internal capitalization omitted).

We conclude that the trial court has thoroughly and ably explained why Appellant's ten to 20 year term of imprisonment for conspiracy to commit aggravated assault was reasonable under the circumstances. Therefore, Appellant's claim on appeal – that her sentence for conspiracy to commit aggravated assault was not reflective of the gravity of the specific offense to which she was convicted – is meritless.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/2/2015